# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **DWAYNE DARRELL BOWENS, SR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:l4-cv-702-WKW-PWG** |
| | ) | |
| **KNOX KERSHAW, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER AND REPORT AND RECOMMENDATION

This action was initiated by Plaintiff Dwayne Bowens, Sr. on July 24, 2014. (Doc. 1). On October 22, 2014, Plaintiff filed his First Amended and Restated Complaint against Defendant Knox Kershaw, Inc. ("Knox Kershaw" or "Defendant") alleging that he was subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* and 42 U.S.C. § 1981, and that he was constructively discharged in violation of 42 U.S.C. § 1981. (Doc. 22).[1]  This case is before the court on a motion for summary judgment by

---

[1] The First Amended Complaint also contained a claim for overtime pay brought pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq*. (Doc. 22 at Count IV). Plaintiff moved to dismiss this claim with prejudice on February 3, 2015, and this court entered an order granting the same on February 4, 2015. (Docs. 27;28).

Defendant. (Doc. 38).  The motion is briefed[2] and is taken under submission without oral argument.

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both.  *See* 28 U.S.C. § 1391.  On November 25, 2014, this matter was referred to the undersigned by Chief U.S. District Judge William Keith Watkins for disposition or recommendation on all pretrial matters.  (Doc. 24). *See also* 28 U.S.C. § 636(b); Rule 72, Fed. R. Civ. P.; *United States v. Raddatz,* 447 U.S. 667 (1980); *Jeffrey S. v. State Board of Education of State of Georgia,* 896 F.2d 507 (11th Cir. 1990).

For the reasons stated herein, the Magistrate Judge recommends that Defendant's motion for summary judgment is due to be **GRANTED**.

## I.    SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Celotex*

---

[2] After filing its memorandum in law in support of its motion for summary judgment (Doc. 30), Defendant moved to file its motion for summary judgment, representing to the court that it had inadvertently filed its memorandum without filing its actual motion. (Doc. 34). This court granted Defendant leave to file the motion, and it did so. (Doc. 38).

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).[3]   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.   Once the moving party has met its burden, Rule 56 requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant.  *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).   When opposing a motion for summary judgment, however, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343 (1996)

---

[3]  In 2007, Rule 56 was amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the evidence [presented by the nonmoving party to rebut the moving party's evidence] is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249.

## II.   BACKGROUND AND STATEMENT OF RELEVANT FACTS[4]

### A.   Background.

Plaintiff is an African-American male. In September 2012, he began working for Defendant as a painter. (Doc. 33-1 at pp. 18; 25).  His immediate supervisor in the painting department was African-American Keith Smith. Smith's position at that time is referred to as "the lead man" in the painting department. (Doc. 33-1 at pp. 25;11). At some point between September 2012 and September 2013, Plaintiff was promoted to "the lead man" in the paint department. (Doc. 33-1 at p. 55). Plaintiff resigned

---

[4] These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.") (citation and marks omitted).  Indeed, the parties make arguments assuming the facts of this case for summary judgment purposes only.

The facts set out *infra* that are based on disputed evidence and are construed in a light most favorable to Plaintiff, and all reasonable inferences have been drawn from the evidence in his favor. That construction and deference ends where there is no evidence to support an allegation of fact.  No findings of fact or credibility determinations are made from the evidence.

without prior notice on September 25, 2013.  (Doc. 33-1 at p. 55).  Plaintiff's claims in the instant lawsuit arise out of events that allegedly occurred at Defendant's premises between April 2013 and Plaintiff's resignation date of September 25, 2013. (Doc. 33-1 at pp. 9; 33).  The material facts of those events are summarized below.

> **(1)   The use of the word "nigger" by a co-employee.**

Plaintiff had been working at Knox Kershaw for eight months when the first event occurred. (Doc. 33-1 at p. 18). In April 2013, Plaintiff was standing beside Grady Lambert, one of Plaintiff's white co-workers, when he overheard Lambert talking about DeVoris "D.J." Jackson, another one of Plaintiff's African-American co-workers.  (Doc. 33-1 at p. 9).  Lambert observed Jackson working on a truck that belonged to Plaintiff's African-American supervisor in the painting department, Keith Smith. (Doc. 33-1 at pp. 9-10). Lambert remarked that Jackson was working on Smith's truck while he was still clocked-in at Knox Kershaw.[5] (*Id*.).  Lambert made the comment, "That's some nigger-beating shit."  (*Id.*). Plaintiff told Lambert that his comment was inappropriate, and Lambert responded that Larry Nelson, one of Plaintiff's white co-workers in the painting department, says "nigger" all the time. (Doc. 33-1 at p. 11). Plaintiff had never heard Larry Nelson use the word "nigger." (Doc. 33-1 at pp. 12-13).  Plaintiff then told his supervisor, Keith Smith, about

---

[5] Plaintiff testified that Jackson had, in fact, already clocked out. (Doc. 33-1 at p. 9).

Lambert's comment, who in turn reported it to Sheila Baker, the human resources manager. Plaintiff also told Smith what Lambert said about Larry Nelson using the same word. (Doc. 33-1 at pp. 11-13). Plaintiff never heard anything else about the incident. (Doc. 33-1 at p. 12; 19).  He never heard Lambert use the word "nigger" again, and also never heard Lambert say anything racially offensive again. (*Id.*).

### (2)    Graffiti in one of the men's restrooms.

It is unclear from the record when exactly the next events occurred, but they occurred between April 2013 and September 2013. (Doc. 33-1 at p. 33). There are at least two restrooms for men to use on Defendant's premises. One is near the floor manager's office in the warehouse. (Doc. 33-1 at p. 23).  The other is near Plaintiff's former workstation.  (Doc. 33-1 at pp. 23-24).  Plaintiff only used the restroom near the floor manager's office. (Doc. 33-1 at p. 24). This restroom was used by both white and African-American employees. (Doc. 33-1 at p. 29).  Though the author is never identified, one or more persons wrote graffiti on the wall in the restroom near the floor manager's office. (Doc. 33-1 at p. 20)  The graffiti consisted of the following: a drawing of a black man being hung by a noose, with a gun pointed at his head, accompanied by the written phrase, "All nigger [sic] must die;" the written phrase "I

hate all nigger bitches;" and below the written phrase, "Pay up Buck,"[6] the written word "nigger." (Doc. 33-1 at pp. 19-23). Plaintiff complained about the graffiti to his supervisor, Keith Smith. (Doc. 33-1 at p. 64). He also mentioned it to supervisor Mike Pruitt. (*Id.*). They "basically [told him] to let it go or Ms. Sheila [Baker] [the human resources manager] would fire [him]." (*Id.*) Plaintiff testified that at some point, Defendant repainted the restroom to cover up the graffiti. (Doc. 33-1 at p. 63). However, Plaintiff also testified the graffiti was on the wall from April until September 2013. (*Id.*).

### (3)   Use of one of the men's restrooms.

Plaintiff never used the other men's restroom, located near the painting workstation. (Doc. 33-1 at pp. 27-28). Plaintiff testified that he never saw an African-American use that restroom, and that quality control supervisor Russell Fort regularly locked the door and complained about African-Americans "dirtying up" the restroom. (Doc. 33-1 at pp. 24; 29).[7] Plaintiff testified that he went to the restroom once intending to use it, but Fort told him that someone was using it. He does not know if Fort was lying. (Doc. 33-1 at p. 101). Plaintiff was not told he was not allowed to use

---

[6] According to Plaintiff, an African-American man named Buck placed bets on football games and owed someone money; hence the phrase, "Pay up Buck." (Doc. 33-1 at pp. 22-23).

[7] There is evidence of record that African-Americans did use the subject restroom. (Doc. 30-3 at p. 3).

the restroom.  (Doc. 33-1 at p. 102).  Nevertheless, Plaintiff felt he was not welcome in the restroom because of Russell Fort's comments, and because when co-worker DeVoris Jackson went into the restroom to get ice (from coolers that were kept in the restroom) on a hot summer day, Russell Fort told him to go get a cup a coffee instead. (Doc. 33-1 at p. 28). Plaintiff complained to his African-American supervisor, Keith Smith, who told him to go to the other restroom and to not "rattle Ms. Sheila['s] feathers."  (Doc. 33-1 at p. 25).

**(4)    Use of the phrase "y'all people" by plant manager and "they" by supervisor.**

On one occasion, Plaintiff had his lunch at the painting workstation. Plaintiff was sitting at DeVoris Johnson's desk when he put a lot of hot sauce on the chicken he was having for lunch.  At that time, white plant manager George Pugh walked by with warehouse supervisor Mike Pruitt[8] and Burt Tompkins.[9]  (Doc. 33-1 at pp. 33; 92).  Pugh said to Plaintiff, "Why y'all people put all this hot sauce on your food?" (*Id*.) Tompkins smiled and Pruitt said, "That's how they eat it." (Doc. 33-1 at pp. 33-

---

[8] Plaintiff testified that Pruitt had the same level of seniority as he. (Doc. 33-1 at p. 92).

[9] Plaintiff stated in his responses to Defendant's written discovery requests that Burt's last name was unknown and that he was the paint shop manager. The court has examined the record and it appears from Sheila Baker's deposition testimony that his full name is Burt Tompkins and that he is currently employed with Knox Kershaw as the cab assembly manager. (Doc. 33-4 at p. 19).

34).  Plaintiff reported these comments to human resources manager, Sheila Baker.

(Doc. 33-1 at p. 38).

**(5)    Plant manager not allowing African-American co-employee John Powell to fish in the pond located on the front of Defendant's premises.**

On one occasion, Plaintiff heard African-American co-employee John Powell

asked white plant manager George Pugh if he could fish in the pond located on the

front of Defendant's premises. (Doc. 33-1 at pp. 36-37).  Plaintiff heard Pugh said,

"no." (*Id.*). Plaintiff reported this incident to human resources manager, Sheila Baker.

(Doc. 33-1 at p. 38). Plaintiff testified that he saw "Caucasian people there" fishing

in the pond, but never saw an African-American doing so. (Doc. 33-1 at p. 36).

**(6)    Harassment intended to make Plaintiff withdraw his EEOC charge.**

Plaintiff filed a charge of discrimination with the Equal Employment

Opportunity Commission on August 16, 2013.  (Doc. 22-1).  After he filed his

complaint, human resources director Sheila Baker, plant manager George Pugh, and

manufacturing manager Mike McKee, either asked him to come to the office or came

to his work station and questioned him about the charge.[10]  (Doc. 33-1 at p. 40; Doc.

33-4 at p. 4). It is unclear from the record how many weeks this lasted, but at some

---

[10]Plaintiff did not testify in his deposition regarding the number of weeks that the questioning
went on, but in his answers to Defendant's written discovery requests, responded that it lasted
four to five weeks. (Doc. 33-3 at p. 17).

point, Plaintiff told them that he would withdraw his charge. (*Id.*).  A co-employee named Randy,[11] who took over Russell Fort's job as quality control supervisor, also asked him, "Why you – why you telling on us?"  (*Id.*).  He did not respond to Randy. (*Id.*).  Plaintiff did not withdraw his EEOC charge. (Doc. 33-1 at p. 52). Plaintiff testified that Sheila Baker gave him a letter telling him that he "had every right to . . . pursue his charge."  (Doc. 33-1 at p. 53).

### (7) Plant Manager and a supervisor's reference to an African-American employee as "boy."

At some point between April and September 2013, Plaintiff heard both plant manager George Pugh and supervisor Mike Pruitt refer to DeVoris Johnson as "boy." (Doc. 33-1 at p. 45).  Plaintiff testified that Pugh and Pruitt's use of the word "boy" when referring to Johnson was "constant," and that Pugh and Pruitt both used the phrase, "Y'all seen my boy?" (Doc. 33-1 at p. 45). On one occasion, Johnson washed Pugh's personal vehicle and Pugh said, "That boy done missed a spot right there." (*Id.*). No one at Knox Kershaw ever called Plaintiff "boy." (*Id.*). Plaintiff never complained about Pugh and Pruitt calling Johnson "boy."  (Doc. 33-1 at p. 47).

---

[11] The court has been unable to ascertain from the record the last name of the individual identified as "Randy." Plaintiff stated in his deposition testimony that Randy's last name is unknown.  (Doc. 33-1 at p. 82).

**(8)    Supervisor's statement that he can't stand black men, but loves black women.**

One day, after they finished painting a machine, Plaintiff had a conversation with employee Leroy Moore about family life and how long each had been married. (Doc. 33-1 at p. 57). Supervisor Mike Pruitt was outside of the door and heard them talking. (*Id.*).  Pruitt then made the comment, "I can't stand black men, but I love black women." (*Id.*).  Plaintiff's wife is African-American. (*Id.*).

**(9)    Supervisor saying, "I got to wash this white man's truck."**

On one occasion, Plaintiff heard supervisor Mike Pruitt say, "I got to wash this white man truck."  (Doc. 33-1 at p. 58).

**(10)    Confederacy-related bumper stickers on truck in employee parking area**.

On one occasion, Plaintiff observed a vehicle in the employee parking lot that had six bumper stickers, three of which contained the following, respectively: the Confederate flag with the words "I'm offended that you're offended;" the words "If I had known this, I would have picked my own cotton;" and the Confederate flag with the words, "Frankly, my dear, I don't give a damn."  (Doc. 33-1 at pp. 58-59). Plaintiff does not identify the owner of the subject vehicle.

**(11)   Co-employees wearing Confederacy-related apparel.**

Plaintiff testified that he observed co-employees wearing Confederacy-related apparel on a regular basis, up until the day of his resignation. (Doc. 33-1 at p. 60). Plaintiff identified one white co-employee, Grady Lambert, who wore Confederacy-related apparel. (Doc. 33-1 at p. 60). Plaintiff testified that African-American supervisor Keith Smith told Lambert to stop wearing the shirt(s), and that Lambert never wore a shirt again. (*Id.*).

**(12)   An unidentified employee in the machine shop telling Plaintiff that he was "a KKK," i.e., a "[k]ool [k]olor [k]id."**

Plaintiff testified that on one occasion, a "guy in the machine shop," whose name he cannot recall, said, "I'm glad to be a KKK." (Doc. 33-1 at p. 70). Plaintiff replied, "What?" and the other employee said to Plaintiff, "Yeah, you a KKK---you a KKK too. . . Oh it's a cool color kid." (*Id.*). Plaintiff responded that it was not funny. (*Id.*).

Based on the preceding 12 incidents, Plaintiff claims he was subjected to a hostile work environment in violation of Title VII and Section 1981 and that he was constructively discharged in violation of § 1981.

**B.     Additional Allegations**.

Plaintiff also alleges that though he was promoted to a supervisory position,

Mike McKee directed Plaintiff to not attend meetings of supervisory personnel, and that he was the only lead person who was directed not to do so. (Doc. 33-3 at p. 17). Plaintiff started applying for jobs with other employers prior to telling Sheila Baker on September 25, 2013 that he was resigning.  (Doc. 33-1 at p. 48). Plaintiff testified that when he resigned on September 25, 2013, Sheila Baker asked him, "Does your leaving have anything to do with what's going on out here?" and that he responded, "No."  (Doc. 33-1 at p. 48). Plaintiff further testified that he told Baker he was quitting because he "couldn't give 100%." (*Id*.) He testified that he then quit, went over and clocked out, and left. (Doc. 33-1 at p. 56). Plaintiff took a job with Progress Rail, which Defendant has identified as a competitor company, and is currently employed by that entity as a paint supervisor. (Doc. 33-1 at p. 76-77).

## III.   DISCUSSION

### A.   Title VII and Section 1981 hostile work environment claims.

Plaintiff alleges that, during his employment with Defendant, he was subjected to a racially discriminatory hostile work environment. Plaintiff's hostile work environment claims are brought under both Title VII and Section 1981.  Both statutes "have the same requirements of proof and use the same analytical framework." *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002)(citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). "In cases involving

13

hostile work environment, this symbiosis is especially apt, since Congress specifically amended section 1981, so plaintiffs could bring hostile work environment claims under that statute as well as under Title VII." *Id*. Accordingly, this court will address the claims concurrently, with the understanding that the analysis is identical for each, and cases cited in the Title VII context are equally applicable to the § 1981 claim and *vice versa*.

"When the workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult [ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012)(alterations in original)(internal citations omitted). "The same is true under § 1981." *Id.*  The Eleventh Circuit in *Jones* explained:

> An employer is therefore liable to an employee for a racially hostile work environment under both statutes if the employee proves that: (1) he was a member of protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his membership in a protected group, (4) it was severe or pervasive enough to alter the terms and conditions of his employment and create a hostile or abusive working environment; and (5) the employer is responsible for the environment under a theory of vicarious or direct liability.

*Id*. at 1292.  *See also Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994)(citing *Henson v. Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982)).

The parties do not appear to dispute the first three factors; rather, the focus in the briefing is on the fourth factor. For the purposes of this Report and Recommendation, the first three factors of the *prima facie* case have been met.

The fourth element of the *prima facie* case contains both a subjective and objective component. *See, e.g, Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000)("Harassment is severe or pervasive for Title VII purposes *only if* it is *both* objectively *and* subjectively severe or pervasive.")(citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)*(en banc)*)(emphasis supplied).  To be actionable, a plaintiff must show not just that he or she subjectively believed the environment to be hostile or abusive, but that a reasonable person in the same or a similar position would also perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). When evaluating the objective severity of the harassment, district courts must examine all of the circumstances, which may include, but is not limited to such factors as the following: the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and whether the conduct unreasonably interfered with the plaintiff's work performance. *Id.* at 23; *see also*, *e.g.*, *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). District courts are instructed to "consider the alleged conduct in context and cumulatively,"

and to "look at the totality of the circumstances" when determining whether the alleged conduct was objectively severe. *Mendoza*, 195 F.3d at 1242.

Assuming, *arguendo*, that Plaintiff demonstrates that his perception of his work environment is subjectively reasonable, he cannot show objective reasonableness on the evidence of record.

As an initial matter, for the purposes of its motion for summary judgment, Defendant "accepts Plaintiff's allegations as true and views them in the light most favorable to [Plaintiff]," and argues it is entitled to summary judgment on the hostile work environment claim.  (Doc. 30 at p. 6).  Though Defendant, for the purposes of its motion, assumes the truth of Plaintiff's allegations and argues that summary judgment is nonetheless due to be granted, Defendant does in some instances offer evidence creating a dispute of fact as to that particular evidence. The court is aware of this evidence, but—for the purposes of this Report and Recommendation alone—given Defendant's position that summary judgment is due to be granted notwithstanding its proffer of evidence to the contrary, treats Plaintiff's allegations (to the extent they are supported by evidence) as if they are true and undisputed, and draws all reasonable inferences in Plaintiff's favor. However, that construction and deference ends where there is no evidence to support an allegation of fact. Where both parties have cited to evidence in support of a point of fact, the court has

16

construed the evidence in a light most favorable to Plaintiff.  By the same token, where Plaintiff offers no evidence to support Plaintiff's allegation, and Defendant offers evidence to the contrary, the evidence is given weight over Plaintiff's unsupported allegation.

Plaintiff complains of twelve incidents that he contends demonstrate the existence of a racially discriminatory hostile work environment, each of which was enumerated in the facts section above. Eleven of these incidents are supported by evidence in the form of Plaintiff's deposition testimony; one is not. The third incident enumerated in the facts section above—that Plaintiff and other African-Americans were discriminated against when they were not allowed to use the men's restroom near the painting workstation—is not only not supported by Plaintiff's evidence; Defendant offers evidence undisputed by Plaintiff that African-Americans regularly used that restroom.

To be clear, there is no evidence of record, in Plaintiff's deposition testimony or otherwise, that Plaintiff was ever told he could not use the restroom nearest the painting workstation.  There is also no evidence of record that African-Americans were not allowed to use the subject restroom; indeed, Plaintiff's testimony was only that he never *saw* an African-American use that restroom. (Doc. 33-1 at pp. 24; 29). The evidence of record is as follows:

○     Plaintiff tried to use the restroom on only one occasion, and on that occasion, was told by the quality control supervisor that someone was in the restroom.  (Doc. 33-1 at p. 101).

○     When a co-worker went into the restroom to get ice, the same supervisor who told Plaintiff that someone was in the restroom told the co-worker to go get a cup of coffee.  (Doc. 33-1 at p. 28).

There is no evidence to prove that the quality control supervisor lied to Plaintiff about the restroom being in use or that his statement was a veiled attempt to keep Plaintiff and/or other African-Americans out of the bathroom; in fact, Plaintiff testified that he did not know if the statement that someone was in the restroom was untrue. (Doc. 33-1 at p. 101).  There is also no evidence to prove that the quality control supervisor's intention in telling Plaintiff's co-worker to go get a cup of coffee was to prohibit him or other African-Americans from using that particular restroom.[12] There is simply no evidence of record that African-Americans

---

[12]  Defendant does not object to this proffered evidence on the basis of hearsay; however, even if the evidence did constitute proof that African-Americans were denied access to that particular restroom, is not only hearsay, but double hearsay.

The evidence tendered in support of or in opposition to summary disposition must be reducible to admissible form. "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir.2012) (internal quotation marks omitted). "Nevertheless, a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id*. at 1293–94 (internal quotation marks omitted). Where there are two layers of hearsay, both layers must be excepted from the hearsay rule for the statement to be admissible. *See* Fed.R.Evid. 805 (providing that "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule"); *see also United States v. Pendas–Martinez*, 845 F.2d 938, 942–43 (11th Cir.1988) ("[E]ven if one level of double-hearsay statement was not

were denied access to the restroom nearest the painting workstation.[13] While Plaintiff's counsel has alluded to this conclusion, and invites the court to make the leap to the conclusion that African-Americans were denied access to that bathroom, Plaintiff has offered no supporting evidence.[14]

Moreover, there is evidence of record that African-Americans regularly used that restroom. Both Sheila Baker and George Pugh signed sworn affidavits attesting that African-Americans routinely use that restroom.  (Docs. 30-2; 30-3). Plaintiff offers no evidence to the contrary; therefore, in the absence of such evidence, Defendant has established through its own evidence of record that the bathrooms

---

hearsay under Rule 801(d)(1)(B), second level of hearsay was not excepted from rule and document was inadmissible" (citing *S. Stone Co. v. Singer*, 665 F.2d 698, 703 (5th Cir. Unit B Jan. 1982)). And "[f]or the purposes of the hearsay-within-hearsay principle expressed in rule 805, 'non-hearsay' statements under rule 801(d) ... should be considered in analyzing a multiple-hearsay statement as the equivalent of a level of the combined statements 'that conforms with an exception to the hearsay rule.' " *United States v. Dotson*, 821 F.2d 1034, 1035 (5th Cir.1987) (citing *S. Stone Co.*, 665 F.2d at 698); accord *Pendas–Martinez*, 845 F.2d at 943).

[13] In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. See Fed.R.Civ.P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990).

[14] Statements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980).  *See also Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

were not segregated. Because there is no evidence to support the existence of the third incident as it relates to the hostile work environment claim, it will not be considered as part of the court's analysis of the totality of the circumstances.

The remaining eleven incidents do not demonstrate that Plaintiff's perception of a hostile work environment is objectively reasonable. They are as follows:

- The use of the word "nigger" by a co-employee.

- Graffiti in one of the men's restrooms.

- Use of the phrase "y'all people" by plant manager and "they" by supervisor.

- Plant manager not allowing African-American co-employee John Powell to fish in the pond located on the front of Defendant's premises.

- Harassment intended to make Plaintiff withdraw his EEOC charge.

- Plant Manager and a supervisor's reference to an African-American employee as "boy."

- Supervisor's statement that he can't stand black men, but loves black women.

- Supervisor saying, "I got to wash this white man's truck."

- Confederacy-related bumper stickers on truck in employee parking area.

- Co-employees wearing Confederacy-related apparel.

○    An unidentified employee in the machine shop telling Plaintiff that he was "a KKK," i.e., a "[k]ool [k]olor [k]id."

All of the above incidents, except two, boil down the use of racial epithets or displays by employees of racially-charged apparel or paraphernalia. Taking each of these nine incidents alone or taking all nine together, these incidents do not rise to level of harassment sufficiently severe or pervasive enough to violate Title VII or § 1981. While abhorrent, these instances do not rise to the legal significance of "severe and pervasive" such that the material terms of Plaintiff's employment were changed. *See*, *e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (teasing, offhand comments, and isolated incidents are insufficient to show a severe and pervasive environment); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."); *McCann v. Tillman*, 526 F.3d 1370, 1379(11th Cir. 2008) ("Although offensive, such instances of racially derogatory language alone [including use of the word 'nigger' and calling an African-American man 'boy' and an African-American woman 'girl'], extending over a period of more than two years, are too sporadic and isolated to establish that her employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment.); *Harris v. Forklift Systems, Inc.*,

21

510 U.S. at 17 at 21, 114 S.Ct. 367 (1993)(finding that the " 'mere utterance of an ... epithet which engenders offensive feelings in a employee,' ... does not sufficiently affect the conditions of employment to implicate Title VII") (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Barrow v. Georgia Pacific Corp*., 2005 WL 1926420, *3 (11th Cir. Aug. 12, 2005) (concluding that evidence that supervisors and co-workers occasionally used terms like "nigger," "boy," and "black ass" towards plaintiff was not sufficiently severe or pervasive to alter conditions of employment); *Cunningham v. Austal, U.S.A., L.L.C.*, 2011 WL 3924185, **6-7 (S.D. Ala. Sept. 7, 2001)(concluding that being subjected to racially-charged graffiti, Confederacy-related apparel and imagery, racial epithets, and being shown a noose, while humiliating, were not enough to establish a racially discriminatory hostile work environment).

The remaining two incidents—another employee not being allowed to fish in the pond, and Plaintiff being asked 2-3 times for several weeks to drop his EEOC charge—viewed in the light most favorable to Plaintiff and taken alone, or in conjunction with the other nine instances, also fail to demonstrate the existence of a hostile work environment. The plant manager's denial of Plaintiff's co-worker's

request to fish in the pond, while white people[15] did so, has not been shown to be anything more than an isolated incident.  *See Faragher*, *supra*. With regard to the requests that Plaintiff drop his EEOC charge, Plaintiff offers no evidence that the alleged badgering regarding his EEOC charge was racially motivated such that it would properly form the basis of a racially discriminatory hostile work environment claim. However, assuming that it was racially-motivated, in light of precedent from within the Eleventh Circuit, this court is unwilling to hold that questioning Plaintiff about his EEOC charge 2-3 times for several weeks is sufficiently severe or pervasive to form the basis of a hostile work environment claim. Summary judgment is, therefore, due to be granted as to both racially discriminatory hostile work environment claims.

Because the fourth factor of the *prima facie* case has not been met, the court need not determine whether the fifth factor—whether the Defendant can be held liable on a theory of vicarious or direct liability—has been met. Therefore, Plaintiff's motion to strike Defendant's argument regarding the same (Doc. 42), which was raised for the first time in its reply brief, is **DENIED as moot**.

---

[15] Plaintiff testified that he saw white *people* fishing at the pond, not white employees. (Doc. 33-1 at p. 36).

### B.      § 1981 Constructive discharge.

A *prima facie* case for discriminatory termination is shown if a plaintiff:  (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by a person outside his protected class.  *See Maynard v. Board of Regents of the Divisions of Universities of Florida Department of Education*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817(1973)).

Plaintiff argues that he was constructively discharged, a point Defendant opposes.  A constructive discharge is, as a matter of law, an adverse employment action and not a legally cognizable claim.  *See Burden v. International Longshoremen's Association, Local No.1410*, 510 F. Supp. 2d 618, 625 (S.D. Ala. 2007) (explaining that a constructive discharge is often asserted by plaintiffs as an independent claim, but that it is, in fact, an adverse employment action and, thus, is only an element of a broader claim) (citing *Rowell v. BellSouth Corp.*, 433 F.3d 794, 806-07 (11th Cir. 2005). To prove a constructive discharge, "a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [his] position would have been compelled to resign.'"  *Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1283-84 (11th Cir. 1999) (citing *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Thomas v. Dillard Department*

*Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)).   The plaintiff bears the burden of proof to show a constructive discharge.   *See*, *e.g.*, *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).   A constructive discharge will not lie where an employer was not given an opportunity and sufficient time to remedy the situation.   *See id*.

In Title VII cases,[16] an alleged constructive discharge is generally analyzed as follows:

> Under the doctrine of "constructive discharge [...] [t]he general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer ... is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee."   *Young v. Southwestern Sav. and Loan Assoc.*, 509 F.2d 140, 144 (5th Cir. 1975).   In assessing constructive discharge claims, we do not consider a plaintiff's subjective feelings about his employer's actions.   Rather, we determine whether "a reasonable person in [the plaintiff's] position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989); *accord*, *e.g.*, *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir. 1997) ("We have long applied an 'objective standard'...."); *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985) ("[S]ubjective impressions as to the desirability of one position over another cannot control our decision.") (quoting *Lee v. Russell Cty. Bd. of Educ.*, 563 F.2d 1159, 1162 (5th Cir. 1977)).

---

[16] The same standard for constructive discharge claims applies in the § 1981 context. *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11th Cir.1997).

*Doe v. DeKalb County School District*, 145 F.3d 1441, 1450 (11th Cir. 1998). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment."[17]  *Hipp v. Liberty National Life Insurance Co.*,  252 F.3d 1208, 1231 (11th Cir. 2001); *see also Bryant v. Jones*, 575 F.3d 1281, 1298-99 (11th Cir. 2009) (same).  Ultimately, whether a constructive discharge occurred is a question of fact.  *See Buckley v. Hospital Corporation of America*, 758 F.2d 1525, 1530-31 (11th Cir. 1985) (treating a constructive discharge as a question of fact for the jury to decide).  The pertinent issue on summary judgment is whether a plaintiff has put forth sufficient evidence to show a genuine issue of material fact tending to show intolerable working conditions.  *See Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 978-79 (11th Cir. 2003) (comparing cases in which a court found or rejected a plaintiff's proffered evidence as giving rise to a material dispute of fact on the matter of intolerable working conditions).

Here, as a matter of law and for the reasons discussed *infra*, because Plaintiff has not presented sufficient evidence to show a hostile work environment, his constructive discharge argument fails.  *See Hipp* & *Bryant*, *supra*.  That

---

[17] This distinction is not without a practical impact, as a plaintiff can produce evidence sufficient to show a hostile work environment but insufficient to give rise to an issue of fact at trial for a constructive discharge.  *See*, *e.g.*, *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316-18 (11th Cir. 1989); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905-06 (11th Cir. 1988).  The bar at summary judgment for a constructive discharge is within reach, but it is very high.

notwithstanding, Plaintiff does not meet the threshold for surviving summary judgment on the issue of constructive discharge.

In support of his constructive discharge argument, Plaintiff claims that though he was promoted during the time period that he contends he was being subjected to harassment, he resigned because "the environment with Defendant was not changing for the better." (Doc. 32 at p. 22). The only solution, in Plaintiff's opinion, was for him to resign. However, when he resigned, he testified that Sheila Baker asked him, "Does your leaving have anything to do with what's going on out here?" and that he responded, "No." (Doc. 33-1 at p. 48). Plaintiff further testified that he told Baker he was quitting because he "couldn't give 100%." (*Id.*) Plaintiff testified that he then quit, went over and clocked out, and left. (Doc. 33-1 at p. 56). As such, he denied Defendant the opportunity to investigate, address and, if necessary, cure the situation.

Plaintiff was not terminated through a constructive discharge. He resigned from his employment and took a job with a competitor. As such, he cannot maintain a cause of action for discriminatory termination, and Defendant is entitled to summary judgment on that claim.[18]

---

[18] Plaintiff's complaint does not contain a discrete retaliation claim. However, Plaintiff styles his constructive discharge claim as a "retaliatory constructive discharge" claim, pursuant to 42 U.S.C. § 1981. (Doc. 22). Defendant filed a motion for summary judgment on this claim, treating it as a constructive discharge "claim," not a retaliation claim. At no point in his

## IV.   CONCLUSION

Accordingly, for the reasons as stated, it is the **RECOMMENDATION** of the Magistrate Judge that Defendants' motion for summary judgment (Doc. 38) is due to be **GRANTED**.   Judgment is due to be entered in favor of Defendants on all claims.   Plaintiff's motion to strike (Doc. 42) is **DENIED as moot**.

Finally, it is **ORDERED** that the parties shall file any objections to this recommendation on or before **November 27, 2015.**   Any objections filed must specifically identify the findings in the Magistrate Judge's recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by

---

opposition to the motion does Plaintiff clarify that his claim is for retaliation, as opposed to constructive discharge. Moreover, there is no evidence that Plaintiff filed a separate EEOC charge alleging retaliation based on these events. This notwithstanding, to the extent Plaintiff intended to allege and pursue a retaliation claim, which is not entirely clear, his purported retaliation claim is based on the existence of a constructive discharge. This court has already held that Plaintiff has failed to present evidence to sustain a constructive discharge claim; therefore, summary judgment is likewise due to be granted as to any claim that his constructive discharge was retaliatory.

the District Court except upon grounds of plain error or manifest injustice.  *See*

*Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).[19]

**DONE** and **ORDERED** this 13th day of November, 2015.

/s/ Paul W. Greene
United States Magistrate Judge

---

[19] *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *Bonner*, *supra* (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).